# United States District Court
## District of Massachusetts

```
_____
                               )
In re:                         )
                               )
CELEXA AND LEXAPRO MARKETING AND )   MDL No.
SALES PRACTICES LITIGATION     )     09-2067-NMG
_____)
                               )
MARLENE T. LOCONTE and DELANA S.)
KIOSSOVSKI, on behalf of       )
themselves and all persons     )
similarly situated,            )
                               )
        Plaintiffs,            )     Civil Action No.
                               )     14-13848-NMG
        v.                     )
                               )
FOREST LABORATORIES, INC. and  )
FOREST PHARMACEUTICALS, INC.,  )
                               )
        Defendants.            )
_____)
```

## MEMORANDUM & ORDER

**GORTON, J.**

This case arises out of the marketing and sales of the
related anti-depressant drugs Celexa and Lexapro by defendants
Forest Laboratories, Inc. and Forest Pharmaceuticals, Inc.
("defendants" or, collectively, "Forest").  Plaintiffs Marlene
T. LoConte ("LoConte") and Delana S. Kiossovski ("Kiossovski"),
consumers who purchased Celexa or Lexapro for their minor
children, allege that defendants violated the Racketeer
Influenced and Corrupt Organizations Act ("RICO") and were
unjustly enriched by misrepresenting and concealing material

-1-

information about the efficacy of those drugs in treating major depressive disorder ("MDD") in pediatric patients. LoConte and Kiossovski advance additional state law claims under the Massachusetts Consumer Protection Act, M.G.L. c. 93A ("Chapter 93A") and the Washington Consumer Protection Act ("CPA"), respectively.

Pending before the Court are defendants' request for judicial notice and motion to dismiss plaintiffs' complaint. For the reasons that follow, the request for judicial notice will be allowed and the motion to dismiss will be allowed, in part, and denied, in part.

## I.   **Background**

Celexa and Lexapro are closely-related selective serotonin reuptake inhibitor antidepressants. Forest obtained the approval of the Food and Drug Administration ("FDA") to market Celexa (citalopram) for adult use in 1998 and to market Lexapro for adult use in 2002. It later sought to market both drugs for use in treating MDD in children and adolescents.

### A.   **FDA approval process**

In order to obtain FDA approval to market Celexa and Lexapro as effective for pediatric and adolescent use, Forest was required to make a sufficient showing to the FDA that the drugs would be more effective than placebos in treating MDD in pediatric or adolescent patients. The FDA typically requires

parties to submit at least two "positive" placebo-controlled clinical trials supporting such use.

Drug studies are deemed "positive" if they show statistically significant improvements for patients who are administered a drug rather than a placebo. In contrast, a "negative" study is one that indicates no statistically significant difference in outcomes between patients who are administered the drug and those who receive a placebo.

Drug manufacturers submit the results of such trials to the FDA as part of "new drug applications" ("NDAs"). Through an NDA, a manufacturer may also request FDA approval of use of the drug to treat a specific condition which is known as an "indication." A manufacturer may only market and sell the drug for an approved indication.

**B.    Clinical studies and FDA approval of an adolescent indication for Lexapro**

Forest arranged for researchers to conduct four double-blind, placebo-controlled studies on the efficacy of Celexa and Lexapro in treating pediatric and adolescent depression. The first two studies, which examined the efficacy of Celexa, were completed in 2001. Of those studies, Celexa Study 18 ("Wagner Study") produced positive results whereas Celexa Study 94404 ("Lundbeck Study") produced negative results.

Forest submitted the results of the two Celexa studies to the FDA in a supplemental NDA in 2002. The FDA denied Forest's application for a pediatric indication for Celexa after finding that the Lundbeck Study was a clearly negative study.

Two studies of Lexapro's efficacy produced similar results to the earlier Celexa studies. Lexapro Study 15, which was completed in 2004, produced negative results, whereas Lexapro Study 32 was positive.

Celexa's FDA-approved label was revised in February, 2005 to include a description of the Wagner Study and Lundbeck Study. Lexapro's FDA-approved label was revised at the same time to describe Lexapro's negative pediatric study. Both labels added an explicit statement that data were not sufficient at that time to support an indication for use in pediatric patients.

In 2008, Forest submitted the results of the Lexapro studies and the earlier Celexa studies to the FDA in a supplemental NDA. Based on 1) the fact that Celexa Study 18 and Lexapro Study 32 were both positive for efficacy in adolescents and 2) the chemical similarities between Celexa and Lexapro, the FDA permitted Forest to revise its Lexapro label in March, 2009 and market Lexapro as safe and effective in treating MDD in adolescents. Forest never obtained FDA approval to market Celexa for such use.

### C.  Alleged misrepresentations by Forest

Plaintiffs allege that Forest engaged in a comprehensive program to mislead consumers and healthcare professionals into believing that Celexa and Lexapro were clinically effective in treating MDD in children.  The crux of their theory is that Forest deprived consumers of the ability to make an informed decision about whether to purchase or prescribe Celexa or Lexapro for their children by withholding information about the negative efficacy studies and engaging in an aggressive marketing campaign designed to mislead consumers and physicians about the efficacy of Celexa.

### D.  United States' <u>qui tam</u> complaint

In February, 2009, the United States Department of Justice unsealed its <u>qui tam</u> complaint against Forest ("government's <u>qui tam</u> complaint") alleging off-label pediatric promotion and concealment of the Lundbeck Study.

Following the unsealing of the government's <u>qui tam</u> complaint, several national class actions were filed including 1) <u>New Mexico UFCW Union's and Employers' Health and Welfare Trust Fund</u> v. <u>Forest Labs, Inc. et al.</u>, No. 09-cv-11524-NMG (filed Mar. 13, 2009) ("March, 2009 RICO action"), which alleged causes of action under civil RICO and various state consumer protection statutes on behalf of a putative class of TPPs and 2) <u>Anson</u> v. <u>Forest Labs, Inc. et al.</u>, No. 09-cv-11539-NMG (filed

June 9, 2009) ("Anson action"), which asserted civil RICO and consumer fraud claims on behalf of a nationwide consumer class.

In September, 2010, Forest pled guilty to several violations of the Food, Drug and Cosmetic Act and agreed to pay $313 million and to cease and desist its pattern of misconduct.

### E.    Procedural history

Plaintiffs are consumers whose minor children were prescribed Celexa or Lexapro.  LoConte paid $1,476 for Lexapro prescriptions for her fourteen-year-old son from November, 2004 until at least 2010.  Kiossovski paid $60 for Celexa prescriptions for her twelve-year-old daughter between July, 2001 and March, 2002 when her daughter was hospitalized due to worsening depression and the emergence of suicidal ideation.

Plaintiffs filed their complaint in August, 2014 asserting claims under RICO (Counts I and II), Massachusetts Consumer Protection Act (Count III), Washington Consumer Protection Act (Count IV) and the common law for unjust enrichment (Count V). Defendants made a request for judicial notice and moved to dismiss the case in December, 2014.  A hearing was held on the pending motion to dismiss in June, 2015.

## II.  <u>Defendants' request for judicial notice</u>

Under Federal Rule of Evidence 201(b)

> [t]he court may judicially notice a fact that is not
> subject to reasonable dispute because it: (1) is
> generally known within the trial court's territorial

> jurisdiction; or (2) can be accurately and readily
> determined from sources whose accuracy cannot reasonably
> be questioned.

Fed. R. Evid. 201(b). Moreover, the Court

> must take judicial notice if a party requests it and the
> court is supplied with the necessary information.

Fed. R. Evid. 201(c).

Forest requests the Court to take judicial notice of 67

documents: 47 newspaper articles, two medical publications,

eight press releases, six complaints filed in other federal

courts and four FDA-approved drug labels for Celexa and Lexapro.

Defendants ask for judicial notice of the fact that the articles

were published, the dates of their publication and the existence

of their contents.

Plaintiffs contend that the request is improper because

those documents are being used to support defendants' statute of

limitations ("SOL") argument, which is an affirmative defense.

They aver that the Court cannot allow a motion to dismiss based

on an affirmative defense unless the facts used to establish

that defense are on the face of the complaint.

The First Circuit Court of Appeals has clearly stated,

however, that an action can be dismissed on the basis of an

affirmative defense as long as the facts

> from the allegations of the complaint, the documents (if
> any) incorporated therein, matters of public record, and
> other matters of which the court may take judicial

> notice....conclusively establish the affirmative
> defense.

In re Colonial Mortgage Bankers Corp., 324 F.3d 12, 16 (1st Cir.
2003). A court therefore may take judicial notice of facts
outside the complaint when adjudicating a motion to dismiss
based on an affirmative defense. See Plumlee v. Pfizer, Inc.,
2014 WL 4275519, at *4, n. 2 (N.D. Cal. Aug. 29, 2014) (taking
judicial notice of various publications, court records and FDA-
approved drug labels).

Plaintiffs further argue that it is inappropriate to take
judicial notice of the contents of the 47 newspaper articles.
Defendants are not, however, asking the Court to accept the
truth of the contents in those articles but rather the fact that
the contents were published on a certain date. When the
authenticity of a newspaper article cannot be reasonably
questioned, a court may take judicial notice of the fact that
the articles were published, without taking judicial notice of
the truth of their contents. See Garber v. Legg Mason Inc., 347
Fed. App'd 665, 669 (2d Cir. 2009).

Plaintiffs have not challenged the authenticity of any of
the 67 documents listed in defendants' request. Accordingly,
the Court takes judicial notice of those documents.

## III. **Defendants' motion to dismiss**

### A. **Legal standard**

To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007). The Court must accept all factual allegations in the complaint as true and draw all reasonable inferences in the plaintiff's favor. Langadinos v. Am. Airlines, Inc., 199 F.3d 68, 69 (1st Cir. 2000). The Court, however, need not accept legal conclusions as true. Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949 (2009). Threadbare recitals of the legal elements, supported by mere conclusory statements, do not suffice to state a cause of action. Id. Accordingly, a complaint does not state a claim for relief where the well-pled facts fail to warrant an inference of any more than the mere possibility of misconduct. Id. at 1950.

### B. **Statute of limitations ("SOL")**

#### 1. **RICO claims**

The SOL for civil RICO claims is four years after the plaintiff discovers or should have discovered the injury. See Rotella v. Wood, 528 U.S. 549, 552-55 (2000). The accrual of the limitations period is computed from "the point of injury or its reasonable discovery" and not from the "reasonable discovery

of a pattern [of racketeering activity]." Id. at 558; Lares
Grp., II v. Tobin, 221 F.3d 41, 43 (1st Cir. 2000).

Forest contends that plaintiffs should have been on notice
of their alleged injuries by 2005 because 1) a number of
articles were published in 2004 in The New York Times alleging
that Forest concealed the Lundbeck study and discussing the
negative result of the Lundbeck Study, 2) Forest issued several
press releases in 2004 and 2005 announcing the results of the
Lundbeck study and a negative Lexapro pediatric study and 3)
Forest revised both the Celexa and Lexapro labels in early 2005
to describe the additional studies and state that "the data were
not sufficient to support a claim for use in pediatric
patients."[1]  Defendants also refer to all of the publications and
documents listed in their request for judicial notice to further
bolster their argument.

Although the relevant Celexa and Lexparo clinical study
results were publicized via numerous channels by 2005, the Court
has previously declined to find as a matter of law at the motion
to dismiss stage that sophisticated third-party payers ("TPPs")

---

[1] Forest contends that Kiossovski should have been on notice of
her claims as far back as March, 2002 when her minor daughter
was hospitalized due to worsening depression.  Even if
Kiossovski should have begun taking steps in 2002 to discover
why Celexa was ineffective in treating her daughter's
depression, however, it still remains a jury question as to
exactly when she should have discovered her claims.

should have been on notice of a RICO injury that year. <u>In re</u> <u>Celexa & Lexapro Mktg. & Sales Practices Litig.</u>, 2014 WL 7009339, at *4 (D. Mass. Dec. 12, 2014) ("December, 2014 Memorandum & Order").  It therefore reaches the same conclusion as to consumers and will leave the determination of whether plaintiffs should have discovered their injuries as of 2005 to the finder of fact.

Citing to the December, 2014 Memorandum & Order, Forest then contends that the SOL accrued at the latest in March, 2009 when a RICO class action on behalf of a putative nationwide class of TPPs was filed following the unsealing of the government's <u>qui tam</u> complaint.  Defendants' reliance on the Court's earlier decision is misplaced, however, because plaintiffs in this case are consumers and not sophisticated TPPs.  The Court had reached its conclusion that TPPs should have been on notice of the March, 2009 RICO action based on case law barring RICO claims brought by TPPs beyond the date of an initial TPP lawsuit because TPPs are

> for the most part sophisticated institutions with sophisticated advisors....[with] expertise in merchandising of pharmaceuticals and fiduciary responsibilities to their clients.

<u>In re Zyprexa Products Liab. Litig.</u>, 253 F.R.D. 69, 195-96 (E.D.N.Y. 2008) <u>rev'd on other grounds sub nom.</u> UFCW Local 1776 v. <u>Eli Lilly & Co.,</u> 620 F.3d 121 (2d Cir. 2010).  Given that the

running of the SOL is usually a question for the jury, In re Lupron Mktg. & Sales Practices Litig., 295 F. Supp. 2d 148, 183 (D. Mass. 2003), the Court declines to extend its ruling with respect to the March, 2009 SOL accrual date to consumer plaintiffs. Similarly, it will leave the determination as to whether plaintiffs should have been on notice of their RICO claims following the filing of the Anson action in June, 2009 to the finder of fact.

### 2. Plaintiffs' state law claims

The limitations periods for LoConte's Chapter 93A and unjust enrichment claims are four years and three years, respectively. M.G.L. c. 260 §§ 5A and 2A. Pursuant to the discovery rule,

> the statute of limitations starts when the plaintiff [1] discovers, or [2] reasonably should have discovered, that [she] has been harmed or may have been harmed by [defendants'] conduct.

Passatempo v. McMenimen, 461 Mass. 279, 294 (2012) (citations omitted). Moreover,

> [r]easonable notice that a particular product or a particular act of another person may have been the cause of harm to a plaintiff creates a duty of inquiry...

Bowen v. Eli Lilly & Co., 408 Mass. 204, 210, (1990).

The statutes of limitations for Kiossovski's Washington Consumer Protection Act and unjust enrichment claims are also

four years and three years, respectively. Wash. Rev. Code §§ 19.86.120 and 4.16.080(3).  Under a similar discovery rule,

> a cause of action accrues when the plaintiff, through the exercise of due diligence, knew or should have known the basis for the cause of action.

Shepard v. Holmes, 345 P.3d 786, 790 (Wash. Ct. App. 2014) (internal quotation and citation omitted).

LoConte alleges that she learned of her claims in late November, 2013 and Kiossovski alleges that she learned of her claims in January, 2014.  Although both plaintiffs contend that they could not have discovered the fraudulent nature of Forest's conduct any earlier, neither articulates what occurred on those dates to enable her to discover her claims or why she could not have discovered the relevant facts earlier when other plaintiffs were able to do so.

The Court has, however, left the determination of the accrual date with respect to these consumer plaintiffs to the finder of fact.  It therefore concludes that plaintiffs' state law claims are not time-barred at this stage of the litigation.

### C.    Substantive claims

#### 1.    Violations of civil RICO, 18 U.S.C. §§ 1962(c) and (d) (Counts I and II)

In order to have standing to pursue claims under RICO, plaintiffs must allege

> (1) a violation of section 1962; (2) injury to business
> or property; and (3) causation of the injury by the
> violation.

Hecht v. Commerce Clearing House, Inc., 897 F.2d 21, 23 (2d Cir.

1990). With respect to the second element, adequately pleading

injury "requires proof of a concrete financial loss and not mere

injury to a valuable intangible property interest." Maio v.

Aetna, Inc., 221 F.3d 472, 483 (3d Cir. 2000). The alleged

injury cannot be hypothetical or speculative. Circiello v.

Alfano, 612 F. Supp. 2d 111, 114 (D. Mass. 2009).

Defendants contend that plaintiffs fail to plead a

cognizable RICO injury because they have not alleged that the

drugs were ineffective treatments for their children

specifically. While acknowledging that Kiossovski states that

her daughter's depression worsened while taking Celexa,

defendants maintain that plaintiffs' only theory of injury is

that they paid for drugs while being deprived of material

information to make an informed decision. Forest avers that

such a deprivation of information, absent an allegation that the

drugs were defective, is too hypothetical and speculative to

serve as a RICO injury because plaintiffs suffered no tangible

harm to their business or property. The Court agrees, but only

with respect to LoConte's RICO claim which was based on her

purchase of Lexapro.

Plaintiffs frame their injury resulting from Forest's misrepresentations as an inability to make

> an informed decision about whether to purchase Celexa and Lexapro for pediatric depression [and the] deception directly caused an overvaluation of the drugs, which resulted in payments for Celexa and Lexapro that, absent the fraud and deception, would never have occurred.

Although a lack of information may otherwise be insufficient to serve as a RICO injury, plaintiffs' complaint also alleges that Forest's fraudulent scheme caused them

> to pay for Celexa and Lexapro prescriptions in order to treat children and adolescents for whom the drugs had been shown to be ineffective and unsafe.

Plaintiffs' allegations of the drugs' ineffectiveness are, however, contradicted, in part, by their own admission that the FDA approved Lexapro for the treatment of adolescent MDD in 2009. The Court cannot therefore conclude that plaintiffs have plausibly alleged that Lexapro is medically ineffective for treating MDD in adolescents. Because LoConte does not contend that Lexapro was ineffective as to her son, her alleged RICO injury is inadequate because it is akin to a lack of informed decision before purchasing a product with undisclosed risks that never appear. See In re Bridgestone/Firestone, Inc. Tires Products Liab. Litig., 155 F. Supp. 2d 1069, 1092 (S.D. Ind. 2001) (rejecting the lack of informed decision as a RICO injury for plaintiffs who purchased tires without being informed of the

product defects because the safety risks never manifested themselves).

Plaintiffs contend that their RICO injury is identical to that in In re Neurontin Mktg. & Sales Practices Litig., 712 F.3d 51, 59 (1st Cir.) ("In re Neurontin - Aetna") cert. denied sub nom. Pfizer Inc. v. Kaiser Found. Health Plan, Inc., 134 S. Ct. 786 (2013), which affirmed the district court's determination that a TPP plaintiff's payment for off-label prescriptions of a drug that was ineffective for off-label indications was sufficient evidence of economic injury.

The subject drug in In re Neurontin – Aetna and related decisions is not, however, directly applicable to Lexapro because the TPP plaintiffs in those cases proved their economic injury by showing that the drug "was ineffective for the promoted off-label uses, and the district court so found." In re Neurontin Mktg. & Sales Practices Litig., 712 F.3d 21, 47 (1st Cir.) ("In re Neurontin – Kaiser") cert. denied sub nom. Pfizer Inc. v. Kaiser Found. Health Plan, Inc., 134 S. Ct. 786 (2013). Here, LoConte has not adequately alleged that Lexapro is ineffective for the treatment of adolescent MDD in light of the FDA's approval for such an indication.

The Court's conclusion in its December, 2014 Memorandum & Order that the TPP plaintiff alleged a RICO injury with respect to reimbursements of Lexapro prescriptions is also

-16-

distinguishable.  Because TPPs reimburse for a large number of

prescriptions, at least some economic injury can be presumed at

the motion to dismiss stage if a drug has conflicting efficacy

study results and has not been proven to be effective for every

single one of their insureds.  See In re Neurontin – Aetna, 712

F.3d at 59 n.6 (rejecting the argument that a TPP has the burden

of proving that none of its members received any benefit from

the drug in order to support a claim of injury).  For individual

consumers, however,

> a plaintiff who is fraudulently induced to enter into a
> transaction does not suffer injury within the meaning of
> § 1964(c) until the defendant fails to perform—that is,
> until it becomes clear that the plaintiff will not get
> the benefit of the bargain.

Maio, 221 F.3d at 490 (citation omitted).  LoConte has not

alleged that the drug was ineffective as to her and therefore

she lacks standing to pursue her RICO claims.

In contrast, the Court concludes that plaintiff Kiossovski

has adequately pled a RICO injury based on the purchase of an

ineffective drug because she has made sufficient allegations

that Celexa is ineffective for pediatric and adolescent MDD

indications.  If Celexa is found to be ineffective for such

indications, by definition it also would be ineffective as to

plaintiff's daughter because any benefit due to the placebo

effect cannot be attributable to the drug itself. See In re

Neurontin – Kaiser, 712 F.3d at 48 (noting that a drug is

-17-

ineffective when it is "no more effective than placebo for the indications at issue").

Accordingly, defendants' motion to dismiss Counts I and II will be allowed with respect to LoConte's claims and denied as to Kiossovski's claims.

### 2. Chapter 93A (Count III)

Chapter 93A proscribes "unfair methods of competition and unfair or deceptive acts or practices" by those engaged in trade or commerce and authorizes a business to sue another for engaging in such practices. M.G.L. c. 93A §§ 2, 11. To state a claim under Chapter 93A, a plaintiff must allege that she 1) suffered an economic injury 2) caused by 3) an unfair or deceptive act or practice. Tyler v. Michaels Stores, Inc., 464 Mass. 492, 501-02 (2013).

LoConte alleges that her injury is the denial of "the opportunity to make fully informed decisions" before purchasing Lexapro and that she would not have bought the drug had she been fully informed about the efficacy studies. She contends that this "informed choice" theory of injury is viable under Massachusetts law and, in particular, Leardi v. Brown, 394 Mass. 151, 159 (1985), which states that the mere "invasion of any legally protected interest of another" is a per se form of injury under Chapter 93A.

Later decisions by the Massachusetts Supreme Judicial Court declined, however, to follow the <u>Leardi</u> holding and clarified that

> the fact that there is [] a violation [of a consumer's legal right] does not necessarily mean the consumer has suffered an injury or a loss entitling her to at least nominal damages and attorney's fees; instead, the violation of the legal right that has created the unfair or deceptive act or practice must cause the consumer some kind of separate, identifiable harm arising from the violation itself.

<u>Tyler</u>, 464 Mass. at 503; <u>see also</u> <u>Rule</u> v. <u>Fort Dodge Animal Health, Inc.</u>, 607 F.3d 250, 253-54 (1st Cir. 2010) (summarizing cases).

LoConte must therefore plead an economic injury rather than the "abstract" denial of opportunity to make an informed decision, which she has failed to do. <u>Rule</u>, 607 F.3d 250, 253. LoConte does not allege that she suffered any prior or potential future harm from the Lexapro prescriptions or even that they were ineffective for her son over the course of approximately six years.

The First Circuit has rejected a similar consumer claim brought by a plaintiff who purchased dog medicine and later learned of risks that the manufacturer had concealed at the time of her purchase. <u>Rule</u>, 607 F.3d 250, 251. The plaintiff sought to recover the difference between the price she paid for the drug and its worth had the risks been disclosed but the court

held that she failed to plead a cognizable injury under Chapter 93A because she received the benefit of the drug without suffering its purported deficiencies. Id. at 254-55.

Decisions in other federal courts evaluating Chapter 93A claims in the pharmaceutical context also suggest that plaintiffs' "informed choice" theory is not viable under Massachusetts law. See, e.g., Sergeants Benevolent Ass'n Health & Welfare Fund v. Sanofi-Aventis U.S. LLP, 2014 WL 1894303 (E.D.N.Y. May 12, 2014) (finding no compensable injury under Chapter 93A even if doctors had not prescribed and plaintiffs had not purchased the subject drug absent the alleged misrepresentations).

Accordingly, Count III of plaintiffs' complaint will be dismissed.

### 3. Washington Consumer Protection Act (Count IV)

To state a claim under the Washington CPA, a plaintiff must allege 1) an unfair or deceptive act or practice, 2) occurring in trade or commerce, 3) public interest impact, 4) injury to plaintiff's business or property and 5) causation. Hangman Ridge Training Stables, Inc. v. Safeco Title Ins. Co., 105 Wash. 2d 778, 780 (1986); Wash. Rev. Code § 19.86.010 et seq. Although "the injury involved need not be great, or even quantifiable, it must be an injury to business or property." Ackley v. Sec. Life

Ins. Co. of Am., 2014 WL 3767459, at *5 (W.D. Wash. July 31, 2014) (internal quotation and citation omitted).

Forest contends that Kiossovski cannot pursue a claim under the CPA based on a lack of informed choice theory because it is a "sort of mental injury that the CPA does not recognize," citing Brotherson v. Prof'l Basketball Club, L.L.C., 604 F. Supp. 2d 1276, 1296 (W.D. Wash. 2009). That same case suggests, however, that plaintiff's claim would survive a motion to dismiss by alleging

> evidence that there is a difference in the value of the benefits [she] received and the value of the same benefits accompanied by the disclosure [of the misrepresentations].

Id. Kiossovski alleges that Forest's "deception directly caused an overvaluation of the drugs" and resulted in payments for Celexa that would not have occurred otherwise. She has therefore sufficiently alleged an injury under the CPA.

Moreover, plaintiff has adequately pled causation because she claims that Forest's misrepresentations about the efficacy of Celexa were made to all physicians and consumers and that absent such fraud, she would not have purchased the drug.

The Court concludes that plaintiff has sufficiently alleged a claim under the CPA. Accordingly, defendants' motion to dismiss Count IV of the complaint will be denied.

### 4.    Unjust enrichment (Count V)

Defendants contend that plaintiffs have failed to allege that Forest received an unjust benefit at their expense because plaintiffs benefited from the drug and were not injured by the drug.  With respect to plaintiff LoConte, the Court agrees and the motion to dismiss Count V as to her will be allowed.

Because plaintiff Kiossovski's RICO and Washington CPA claims remain viable, Count V as to Kiossovski will also survive defendants' motion to dismiss.


## ORDER

For the foregoing reasons,

1)    defendants' request for judicial notice (Docket No. 8) is **ALLOWED;** and

2)    defendants' motion to dismiss plaintiffs' complaint (Docket No. 11) is, with respect to Counts I, II, III and V as to plaintiff LoConte (the RICO, Chapter 93A and unjust enrichment claims as to plaintiff LoConte), **ALLOWED, but is otherwise DENIED.**  Counts I, II, IV and V as to plaintiff Kiossovski survive defendants' motion.


**So ordered.**

/s/ Nathaniel M. Gorton
Nathaniel M. Gorton
United States District Judge

Dated June 15, 2015